**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**BRIANNE SULLIVAN**
80 Seaton Place, NW
Washington, D.C. 20002

**CHARLES VAILLANT**
903 Rock Dove Ct.
Arnold, MD 21012

    and

**ASHLEY ALBRIGHT**
504 Leyland Lane
Annapolis, MD 21409

*Individually and on Behalf of All Others Similarly Situated*,

    *Plaintiffs,*

    v.

**VANGUARD PARKING SOLUTIONS INC.,**
Serve On:
Cogency Global Inc.
850 New Burton Rd., Ste. 201
Dover, DE  19904,

**JOYCE PARKING L.L.C.,**
Serve On:
William Torres
655 New York Ave. NW, Ste. 830
Washington, DC  20001,

**JEMAL'S HECHT EAST T L.L.C.,**
Serve On:
Corporation Service Company
1156 15th St. NW, Ste. 605
Washington, DC  20005

    and

**Case No.** _____

**DEMAND FOR JURY TRIAL**

**JEMAL'S GARRETT PLACE, L.L.C.,**
<u>Serve On</u>
Lane H. Potkin,
7602 Elmore Ln.
Bethesda, MD  20817,

    *Defendants.*

## <u>CLASS ACTION COMPLAINT FOR DAMAGES & PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF</u>

Plaintiffs Brianne Sullivan, Charles "Pat" Vaillant, and Ashley Albright, on behalf of themselves and all other similarly situated individuals, upon knowledge as to themselves and upon information and belief as to all other matters, bring this class action complaint against Defendants Vanguard Parking Solutions Inc. ("Vanguard"), Joyce Parking L.L.C., Jemal's Hecht East T L.L.C., and Jemal's Garrett Place, L.L.C. for violations of federal and state laws relating to their illegal operations at two parking garages located, respectively, in Washington D.C. and Annapolis, Maryland.

### INTRODUCTION

1.　　In recent years, public parking garages have begun to move away from payment systems involving paper tickets and physical barriers to automated systems that obviate the need to pay for physical on-site staff.  In many instances, such parking now involves paying via an online platform or application and, in conjunction with the payment, providing vehicle information, such as a license plate number.

2.　　Vanguard has seized on this demand for modern convenience and orchestrated a scheme calculated not to streamline parking, but to systematically exploit it at the expense of consumers' rights and pocketbooks.  Leveraging license-plate surveillance and obscure, unreadable "contracts," they quietly harvest drivers' personal data from government records,

inflate minor parking charges into outsized demands, and funnel unsuspecting consumers into a one-way payment trap with no meaningful avenue for dispute resolution.  Under those circumstances, what appears to be a seamless, tech-enabled parking solution is in reality a coercive revenue machine, one that relies on deception, information asymmetry, and procedural dead ends to pressure and bully consumers into paying sums far exceeding any legitimate fee.

3.    The entrances and exits of the garages utilizing Vanguard's surreptitious technological model are manned with surveillance technology that monitors vehicles as they enter and exit the garage, and logs photos and vehicle data.  If a driver doesn't pay for parking (perhaps due to a technical error through no fault of their own, their misunderstanding of the process, or some other innocuous reason), the system flags their vehicle as in violation of the garage's parking terms.  Vanguard then uses alleged violators' vehicle license plate numbers to illegally access drivers' private data from state motor vehicle databases, and sends violation notices to drivers' homes.

4.    The violation notices Vanguard sends, on behalf of the owners and operators of the garages where Vanguard operates (including the other named Defendants here), assess fines and fees that are many magnitudes greater than the cost of actually parking—for instance, $90 for an alleged failure to pay for ten minutes of parking.

5.    Defendants base this revenue model on a so-called "Parking Contract" posted in small print in inconvenient locations in the garages, purporting to bind drivers who have never read or signed the agreement, but merely parked in the garage.  The "Parking Contract" purports to authorize the acquisition of personal information, waive claims, and compel arbitration. Vanguard relies on this signage to justify obtaining drivers' personal information under the

federal Drivers Privacy Protection Act ("DPPA") and to impose excessive charges, even though Vanguard's use of personal information does not fall within the DPPA's disclosure exceptions.

6.     As demonstrated by a vast number of consumer complaints lodged with state attorneys general offices, the Better Business Bureau, and other organizations, Vanguard makes it nearly impossible for consumers to dispute the excessive charges levied.  Plaintiffs and other consumers have experienced an inability to reach a live representative, the absence of a practical dispute mechanism on Vanguard's website, and fruitless exchanges over email with customer service representatives who ignore evidence of Vanguard's mistakes and simply claim that charges are valid.

7.     The unfair, deceptive, and abusive actions of Vanguard and the other Defendants violate consumer protection statutes in the District of Columbia and Maryland, and the use of debt-collection tactics to extract inflated sums constitutes unlawful collection activity.

8.     Plaintiffs seek to halt these deceptive practices, secure redress for the affected consumers, and vindicate statutory privacy and consumer-protection rights.  Injunctive relief is necessary to deter Defendants' unlawful conduct, remediate the injuries already inflicted, and protect the public from further harm.

## JURISDICTION AND VENUE

9.     This Court has subject-matter jurisdiction over this case under 18 U.S.C. § 2724, 28 U.S.C. § 1331, and 28 U.S.C. § 1367.

10.    This Court also has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2)(A), because, on information and belief, the proposed Class consists of 100 or more members, at least one member of the proposed Class is a citizen of a

4

state different from at least one Defendant, and the amount in controversy exceeds $5,000,000, exclusive of interest and costs.

11.     The Court has personal jurisdiction over all Defendants because they conduct business in the District of Columbia and have caused and continue to cause tortious injury in the District of Columbia.  In addition, Defendants Joyce Parking L.L.C. and Jemal's Hecht East T L.L.C. are entities formed in the District of Columbia.

12.     The Court may exercise supplemental jurisdiction over the D.C. and Maryland state law claims pursuant to 28 U.S.C. § 1367(a) because those claims are part of the same case and controversy as the federal claims over which this Court has original and/or exclusive jurisdiction.

**PARTIES**

13.     Plaintiff Brianne Sullivan is a resident of Washington, D.C.

14.     Plaintiff Charles "Pat" Vaillant is a resident of Arnold, Maryland.

15.     Plaintiff Ashley Albright is a resident of Annapolis, Maryland.

16.     Defendant Vanguard Parking Solutions Inc. ("Vanguard") is a Delaware corporation with its principal place of business in Hollywood, Florida.  Vanguard operates "gateless" technology in parking garages, including the garages located at 1515 New York Avenue, NE, Washington, D.C., 20002 (the "1515 New York Ave. Garage") and 275 West St., Annapolis, MD, 21401 (the "275 West St. Garage").

17.     Defendant Joyce Parking L.L.C. ("Joyce") is a D.C. limited liability company with its principal place of business in Washington, D.C.  Joyce operates parking garages throughout the Washington metropolitan area, including the 1515 New York Ave. Garage and the 275 West St. Garage.  Joyce has three owners, including Norman Jemal and William Torres.

18.    Defendant Jemal's Hecht East T L.L.C. ("Jemal's D.C.") is a D.C. limited liability company with its principal place of business in Washington, D.C.  Jemal's D.C. owns the 1515 New York Ave. Garage.  Norman Jemal and Douglas Jemal are the owners of Jemal's D.C.

19.    Defendant Jemal's Garrett Place, L.L.C. ("Jemal's MD") is a Maryland limited liability company with its principal place of business in Bethesda, Maryland.  Jemal's MD owns the 275 West St. Garage.[1]  Douglas Jemal and/or his son(s) are owners of Jemal's MD.

## FACTUAL ALLEGATIONS

### *Vanguard's Business Model*

20.    Vanguard is a private parking monitoring and enforcement company that uses License Plate Recognition ("LPR") technology to monitor parking garages.  LPR technology uses cameras and computer vision to automatically read vehicle license plates from images or video.  It works by capturing an image of a vehicle, detecting and isolating the license plate, enhancing the image for clarity, and then using optical character recognition ("OCR") to convert the plate's characters into text.

---

[1] At times, Plaintiffs refer to Jemal's D.C. and Jemal's MD together as "Owners."

21.    Vanguard's website contains an infographic describing their LPR enforcement system as follows:



*Image 1: Screenshot from Vanguard's website*[2]

22.    The website notes the lack of human intervention or review needed to ticket drivers.   The website further exhorts garage owners and operators to "Turn Every Lot Into a Profit Center."  Vanguard states that customers can "Discover Hidden Revenue in Your Parking Lot" and "Start earning more from every space in as little as 30 days."  Vanguard promises potential customers: "We handle everything enforcement while increasing your compliance. You keep the upside."[3]

23.    Vanguard states that its automated enforcement technology will "directly increase your lot's profitability."[4]

24.    Vanguard's website proffers that Vanguard clients (*i.e.*, garage owners and operators) do not need to manage violation disputes.  Rather, it states: "We provide a simple,

---

[2] https://vanguardparking.co/ (last visited June 5, 2026).
[3] Id.
[4] Id.

built-in appeal process with clear documentation and review tracking all via our platform—no need for your staff to get involved."

25.     Private garage owners and/or primary operators contract with Vanguard to provide parking enforcement at garages they own and/or operate. Vanguard collects funds from drivers on behalf of those owners/operators and charges the owners/operators a fee for its services.

### 1515 New York Ave. Garage

26.     Defendants Joyce and/or Jemal's D.C. have contracted with Vanguard to provide LPR enforcement at the 1515 New York Ave. Garage, which is part of a mixed-use residential and retail complex.  The 1515 New York Ave. Garage directly serves a Target department store at the complex and has 156 parking spaces.

27.     Joyce and/or Jemal's D.C. selected Vanguard to maximize the amount of money they could extract from the public with respect to their ownership and operation of the 1515 New York Ave. Garage.

28.     The parking rates at the 1515 New York Ave. Garage range from $3.35 for up to two hours to $20.35 for 24 hours.  The first hour is free.

29.     Drivers who park at the 1515 New York Ave. Garage are not required, as a condition of parking, to provide their names, home addresses, or other personal identifying information to Defendants at the point of entry, at exit, or through any on-site kiosk, attendant, or mobile application.

30.     Three placards titled "Parking Contract" are posted at the 1515 New York Ave. garage—two at the entrance/exit to the garage and a third located outside of automatic doors that lead to an escalator to a Target store.  The "Parking Contract" is not posted outside the entrance to the elevators that offer an accessible way to enter the Target.  The "Parking Contract" appears as follows:



*Image 2: "Parking Contract" at the entrance/exit of 1515 New York Ave. Garage*

31.     The "Parking Contract" contains approximately 552 words. The average reading speed for technical materials such as a legal contract is 50 to 150 words per minute. Accordingly, the average reader would need four to 11 minutes to read the "Parking Agreement."  It also asks drivers to scan a QR code to read the "[f]ull contract[.]"

32.     The font on all three placards is very small and not readily visible to drivers entering and exiting the garage.  It is nearly impossible for a driver to read the "Parking Contract" at the entrance/exit without exiting their vehicle and approaching the sign physically, risking the driver's safety and the ire of drivers waiting in line to park.

9

33.     Once a vehicle pulls into the 1515 New York Ave. Garage, numerous signs direct drivers to pay via one of five mobile applications (ZipBy, Honk, ParkMobile, Flash, or Flix Valet Solutions).  None of these payment signs make any reference to the "Parking Contract."

34.     The "Parking Contract" by the doors to the escalator is next to three other signs that all have to do with payment and have much larger font.  By the time a driver might see this copy of the "Parking Contract," they have already parked and left their car, and have likely already paid via one of the available apps, as well. The "Parking Contract" appears as follows:



*Image 3: "Parking Contract" at Target entrance*

35.     In full, the 552-word "Parking Contract" reads as follows:

PARKING CONTRACT - PRIVATE PROPERTY
IF YOU DO NOT CONSENT TO THIS CONTRACT, EXIT NOW.

By parking here, you agree to the terms of this Contract with Vanguard Parking Solutions, Inc. ("Vanguard"). If you don't own the car you are parking, you are also agreeing to the contract on behalf of the owner of the vehicle you park.

IMPORTANT:
- VANGUARD RECORDS ACTIVITY AT THIS PARKING FACILITY 24/7 using video recording equipment.

KEY TERMS of this Contract:
- YOU MUST PAY the hourly parking fees ("Hourly Fees") in full within 15 MINUTES after entering. If you leave within this time, no Hourly Fees apply.

10

- You agree that VANGUARD may obtain personal information as defined in the Driver's Privacy Protection Act, 18 U.S.C. § 2721 (the "DPPA"), including but not limited to the vehicle owner's name, phone number, physical and email addresses, license plate number, and the vehicle make and model, in order to identify the owner of that vehicle.
- Failure to pay all the Hourly Fees due will result in a PARKING PAYMENT NOTICE that will include additional charges and processing charges (collectively, "Parking Charges").
- In some states, failure to pay in full may also result in your vehicle being towed, booted, or immobilized.
- HOURLY FEES AND PARKING CHARGES ARE NON-REFUNDABLE.
- DISPUTES: If you believe a charge was issued in error, you have 30 days to dispute it.

You can initiate a dispute through the contact form at www.PayParkingNotice.com or by calling (954) 228-3280 and speaking with an agent.

- ARBITRATION: Unresolved disputes shall be resolved through binding arbitration.
- WAIVER: Vanguard and you waive their rights to jury trial and you agree that you may not bring a claim as part of a class action.

**Full contract available here [QR Code]**
and at www.PayParkingNotice.com/parkingcontract or by scanning QR code.

ACTIVITY IN THIS PARKING LOT OR GARAGE (THE "FACILITY") IS RECORDED BY VANGUARD PARKING SOLUTIONS, INC. ("VANGUARD") 24 hours per day, every day. Vanguard uses this video surveillance system to track the time you enter and leave the Facility, and to record pictures of the Facility and of your vehicle and license plate. Vanguard does not monitor the video 24/7 and the system is not designed or intended for security purposes.

By this Contract, the owner of the Facility ("Owner") and Vanguard hereby grant you a license to park in a designated vehicle space in this Facility, as long as you do so in compliance with the posted rules and rates, including timely payment of all of the Hourly Fees. THE HOURLY FEES AND THE METHODS OF PAYMENT ARE SET FORTH ON A SEPARATE SIGN POSTED IN THIS FACILITY.

By parking in this Facility, you agree—on behalf of yourself and, if you are not the owner of the vehicle you are parking, on behalf of that owner—to the terms and conditions of this Parking Contract (the "Contract") and to pay the regular hourly parking fee, including taxes and any municipal and county surcharges (collectively, "Hourly Fees"), within 15 MINUTES AFTER ENTERING THE FACILITY. If you do not want to be bound by this Contract, you must exit this

Facility within 15 minutes of entering. No Hourly Fees will apply if you exit this Facility within 15 minutes of entering.

THE HOURLY FEES are charged 24 hours per day, 365 days a year. If you fail to pay the Hourly Fees within 15 minutes of entering the Facility, or if you pay less than the amount you owe for the time you are parked, you will be in breach of this Contract and will incur PROCESSING FEES OR CHARGES, SURCHARGES AND FEES IMPOSED BY VANGUARD OR THE OWNER OF THE FACILITY (the "PARKING CHARGES"). Parking Charges may total up to $125 per parking incident.

BY PARKING A VEHICLE IN THIS FACILITY, YOU ALSO CONSENT TO VANGUARD'S OBTAINING, SOLELY FOR BILLING AND COLLECTION PURPOSES, RECORDS CONTAINING PERSONAL INFORMATION AS DEFINED IN THE DRIVER'S PRIVACY PROTECTION ACT, 18 U.S.C. § 2721 (the "DPPA"), including but not limited to the vehicle owner's name, address, license plate number, and the vehicle make and model, IN ORDER TO IDENTIFY THE OWNER OF THAT VEHICLE AND TO SEND THAT PERSON NOTICES, INVOICES, AND OTHER DOCUMENTATION RELEVANT TO AMOUNTS OWED FOR HOURLY FEES AND PARKING CHARGES BECAUSE THAT VEHICLE WAS PARKED IN THIS FACILITY WITHOUT FULL PAYMENT. VANGUARD WILL NOT USE SUCH INFORMATION FOR ANY PURPOSE OTHER THAN COLLECTING HOURLY FEES AND PARKING CHARGES.

YOU AGREE THAT YOU WAIVE ANY CLAIM YOU MIGHT OTHERWISE HAVE AGAINST VANGUARD OR THE OWNER OF THIS FACILITY IN CONNECTION WITH THE ACQUISITION AND USE OF SUCH PERSONAL INFORMATION, INCLUDING WITHOUT LIMITATION CLAIMS UNDER THE DPPA AND ANY APPLICABLE STATE LAW.

If you have not timely and fully paid the Hourly Fees, Vanguard will either place a PARKING PAYMENT NOTICE ("Notice") on your vehicle while it is parked in the Facility or send you a Notice by mail. The Notice will include an invoice setting forth the amount you owe, including all applicable Parking Charges, the due date and any grace period for payment.

Failure to pay the Parking Charges may result in the matter being referred to collections or for legal action. Additionally, if a Notice remains unpaid after its Due Date and you later park your vehicle in a different parking facility monitored by Vanguard, Vanguard may have the right under state law to tow, immobilize, and/or boot your vehicle. Vanguard may also have the right to collect the current balance of the total amounts you owe for parking at all Vanguard-monitored facilities before releasing the vehicle.

**DISPUTES, APPEALS:** You may dispute any invoice or Notice that you believe was issued to you in error by submitting a notice of dispute to Vanguard before the Due Date set forth in the Notice. To submit a dispute, you may call at (954) 228-3280, send us an e-mail at disputes@vanguardparkingco.com, or follow the steps for filing a dispute on our website at https://payparkingnotice.com/pay. Vanguard will inform you of its decision regarding the dispute within 5 business days after hearing from you. If you do not agree with Vanguard's decision, you may appeal to Vanguard, within 10 days after your receipt of Vanguard's decision, to an independent arbitrator chosen by Vanguard, who will act in accordance with the CONSUMER ARBITRATION RULES ("CAR") of the American Arbitration Association ("AAA"), which are available at www.adr.org.

EXCEPT AS OTHERWISE REQUIRED BY APPLICABLE STATE LAW, ANY AND ALL DISPUTES, CLAIMS OR CONTROVERSIES BETWEEN YOU AND VANGUARD ARISING FROM YOUR PARKING AT THE FACILITY OR UNDER THIS CONTRACT, INCLUDING ANY DISPUTES OR CLAIMS BASED ON CONTRACT, TORT, STATUTE, FRAUD, MISREPRESENTATION OR ANY OTHER LEGAL THEORY, SHALL BE RESOLVED BY FINAL AND BINDING ARBITRATION ADMINISTERED BY THE AAA UNDER ITS CAR RULES. THE SUBSTANTIVE LAW OF ANY ARBITRATION SHALL BE THE LAWS OF THE STATE IN WHICH THE FACILITY IS LOCATED. YOU AND VANGUARD AGREE TO WAIVE ANY RIGHT TO A TRIAL BY JURY OR TO PARTICIPATE IN A CLASS ACTION OR REPRESENTATIVE PROCEEDING, UNLESS VANGUARD AGREES OTHERWISE, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING. AN ARBITRATOR CAN AWARD DAMAGES AND RELIEF AS A COURT WOULD.

THE ABOVE ARBITRATION PROVISION SHALL SURVIVE THE TERMINATION OR EXPIRATION OF THIS CONTRACT.

THE NOTICE AND INVOICE ARE PRIVATELY ISSUED. THEY ARE NOT ISSUED BY A GOVERNMENTAL AUTHORITY OR AGENCY AND ARE NOT SUBJECT TO CRIMINAL PENALTIES.

36.    Vanguard expects consumers to read this "Parking Contract" in full *before* parking their vehicles.

37.    Notably, this "Parking Contract" does not comply with D.C. Municipal Regulations ("DCMR"), Title 24, regulating private parking facilities.  Specifically, 24 DCMR § 609.1 states: "In all areas other than those zoned only for residential use, each licensee shall

13

place and maintain a *legible and conspicuous* sign that is *clearly visible* at every entrance to the licensed premises." (Emphasis added).  24 DCMR § 609.2 further states: "Each sign shall also state, in a *clearly visible manner*, the hourly and daily rates charged for the storage of vehicles on the paid premises."  (Emphasis added).  Finally, 24 DCMR § 609.3 states: "No licensee shall charge, or permit to be charged, any greater fee than is posted at the time of entry."

38.     The "Parking Contract" is not a valid or enforceable contract because, among other reasons: (i) consumers have no reasonable opportunity to review, let alone consent to or form an intent to be bound by, its terms given the inaccessible placement of the signs and the unreadable font size; (ii) Vanguard fails to present the alleged "contract" to consumers and provide an opportunity to click through it when consumers pay for parking; (iii) it purports to bind consumers to unconscionable and/or illegal terms, including but not limited to the waiver of certain rights; (iv) the signage violates local regulations; and (v) its terms are contrary to public policy.

### *275 West St. Garage*

39.     Defendants Joyce and/or Jemal's MD have contracted with Vanguard to provide LPR enforcement at the 275 West St. Garage, which is attached to a commercial building in Annapolis, Maryland.  The garage contains 297 parking spaces and is one of only a few garages that is walkable from the busy, downtown commercial district.

40.     Joyce and/or Jemal's MD selected Vanguard to maximize the amount of money they could extract from the public with respect to their ownership and operation of the 275 West St. Garage.

14

41. The daily parking rate for this garage is $5.70 for up to 2 hours or $7.70 for up to 11:59 P.M. The rates re-set at 11:59 P.M. Accordingly, the daily maximum charge for parking in the 275 West St. Garage is $7.70.

42. The 275 West St. Garage is a four-floor parking garage with two vehicle entrances: the Amos Garrett Boulevard entrance and the Monticello Avenue entrance. In total, the garage is equipped with four LPR cameras nearby the two entrances to read license plates. The Amos Garrett Boulevard entrance places the driver on the third floor (3G) of the garage, while the Monticello Avenue entrance places them on the ground floor (1G).

43. The Amos Garrett Boulevard entrance appears as follows from the outside:



*Image 4: Amos Garrett Boulevard Entrance (Detail: See Images 6 & 7 below)*



*Image 5: Detail of Parking Rate Sign Outside of Amos Garrett Boulevard Entrance*

44.    Posted outside on the right-hand side of this entrance is a plaque titled "Parking Agreement." Given the minuscule font size, the text of the sign is entirely unreadable from inside a vehicle (especially from the driver's side seat) as the driver pulls into the garage. This signage appears as follows at the Amos Garrett Boulevard entrance:



*Image 6: "Parking Agreement" alongside trespass signs outside Amos Garrett Boulevard Entrance (Detail: See Image 7)*



*Image 7: "Parking Agreement" outside Amos Garrett Boulevard Entrance (Size: 17 15/16 inches wide by 23 7/8 inches long)*

45.    Even assuming a driver exited their vehicle and walked around to the passenger side to read it, the "Parking Agreement" is partially blocked by a blue pylon, and there is no room for a pedestrian to stand close enough to read the small text due to the arrangement of the curb and landscaping.

46.    The "Parking Agreement" contains 714 words. The average reading speed for technical materials such as a legal contract is 50 to 150 words per minute. Accordingly, the

average reader would need five to 14 minutes to read the "Parking Agreement." At this entrance, a driver would need to exit their vehicle and stand sandwiched in between their car and the curb and lean over (or stand in the dirt or a bush) for at least five minutes to read the "Parking Agreement," all the while blocking traffic behind them.

47.     Moreover, the "Parking Agreement" is arranged alongside two larger, clearer signs relating to trespassing, thereby suggesting to the average driver who is simply pulling into a garage that it is related to that same issue and does not concern them as a customer.

48.     The Monticello Avenue entrance has an identical (both in content and size) "Parking Agreement" sign posted outside, yet it fares no better with regard to visibility or accessibility. The outside of this entrance appears as follows:[5]



*Image 8: Monticello Avenue Entrance (Detail: Identical "Parking Agreement" Signage)*

---

[5] Although this entrance has a "Permit Parking" sign, anyone can drive through this entrance, which leads to the same public parking area available from the Amos Garrett Boulevard entrance.

17

49.     Like at the Amos Garrett Boulevard entrance, a driver would have to get out of their vehicle and block traffic for five to 14 minutes to fully read the "Parking Agreement."  It is also similarly paired with a "No Trespassing" sign.

50.     Once a vehicle pulls into the 275 West St. Garage using either entrance, the "Parking Agreement" is no longer visible.  Inside, numerous signs direct drivers to pay via one of five mobile applications (ZipBy, Honk, ParkMobile, Flash, or Flix Valet Solutions).[6]  None of the interior signage references the "Parking Agreement."  Moreover, after they have parked, the interior directional signage points pedestrians to the elevator or stairs in order to exit the garage on foot.  Accordingly, a consumer is unlikely to encounter or notice the "Parking Agreement" even after parking.



*Image 9: Walkway to Elevator/Stairs on First Floor of Garage*

51.     The "Parking Agreement" signs located on the outside of each entrance are identical.  They read, in full, as follows:

> NOTICE: YOU ARE ENTERING PRIVATE PROPERTY. THIS PARKING FACILITY IS OWNED BY THE THIRD PARTY LISTED AT THE ENTRANCE TO THE PARKING FACILITY.

---

[6] There is no physical kiosk or attendant stand at which to pay at the 275 West St. Garage.

THIS PARKING LOT OR GARAGE ("PARKING FACILITY") IS MONITORED BY VANGUARD PARKING SOLUTIONS, INC. ("VANGUARD").

PLEASE BE AWARE: THIS PARKING FACILITY IS MONITORED AND RECORDED BY VIDEO RECORDING EQUIPMENT INSTALLED IN THIS PARKING FACILITY BY VANGUARD.

By entering and parking in this parking facility, you agree to the terms and conditions of this Parking Agreement ("Agreement") provided by Vanguard, the property management company, parking operator, and parking owner, which are enforced 24 hours per day, 7 days a week, 365 days a year by Vanguard, the property management company, parking operator, and parking owner.

If you do not consent, you must exit this parking facility and park in a different location not associated with the Owner and Vanguard.

Under this Agreement, the Owner and Vanguard hereby grant you a license to park in a designated vehicle space in compliance with the posted rates (the "Parking Charge") and subject to your full payment of the Parking Charge. If you fail to pay the Parking Charge in full for the parking space and allotted time you selected, or if you park your vehicle without paying any Parking Charge, you will be in breach of this Agreement.

If you are in breach of the Agreement and have not paid your Parking Charge in full, Vanguard will obtain your mailing address through available public records, including your vehicle's registration address, and will send you by mail, either directly or through a third-party service contracted by Vanguard, a PARKING PAYMENT NOTICE ("Notice") for payment due after using the Parking Facility.

The Notice mailed to you will include the amounts you owe, including any applicable Parking Charges, processing charges, surcharges, and taxes. If you pay within 15 days of the parking payment notice date, you will be charged a discounted Parking Charge in the amount of $55.00. If you fail to pay within the 15 days, then you are responsible to pay the full amount of the Parking Charge up to a maximum amount of $125.00. The Notice will give you the option to pay by credit card or debit card online at payparkingnotice.com, by telephone at (954) 228-3280, or by mailing a money order or bank check made out to Vanguard Parking Solutions Inc. and sent to 3389 Sheridan St., Hollywood, FL 33021, Box #328.

Failure to make the payment may result in referring the matter to collections or further legal action. Additionally, if a Notice remains unpaid for 15 days from the date such Notice is issued and you continue to park your vehicle in a Parking Facility managed by Vanguard, Vanguard reserves the right to tow, immobilize, and/or boot your vehicle to the extent permissible by applicable law. If Vanguard

tows or immobilizes your vehicle, then Vanguard has the right to collect the current balance of the total amount you owe, including any applicable Parking Charges, processing charges, surcharges, and taxes, to the extent permissible by applicable law.

To dispute the Parking Charge, you must visit payparkingnotice.com or call (954) 228-3280.

If you have any questions, you may reach us by telephone at (954) 228-3280.

THE NOTICE THAT MAY BE ISSUED BY VANGUARD ON BEHALF OF THE OWNER IS PRIVATELY ISSUED. IT IS NOT ISSUED BY A GOVERNMENTAL AUTHORITY OR AGENCY AND IS NOT SUBJECT TO CIVIL OR CRIMINAL PENALTIES.

By parking at this Parking Facility, you give permission to Vanguard, its agents, affiliates, and the Owner to obtain the following information, including but not limited to: your vehicle owner registration, vehicle owner address, license plate number, vehicle make, and model. You consent to Vanguard to use video and camera systems to track the time you enter and exit the Parking Facility. This information will be used to record and take pictures of the Parking Facility, take pictures of your vehicle and license plate. This information will be used for the purpose of preparing and sending you a Notice.

NOTICE OF ARBITRATION

ANY DISPUTE OR CONTROVERSY ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT, OTHER THAN IN A CLAIM FOR INJUNCTIVE RELIEF, SHALL BE SETTLED EXCLUSIVELY BY ARBITRATION, CONDUCTED BY AN ARBITRATOR IN PALM BEACH COUNTY, FLORIDA, OR THE COUNTY AND STATE WHERE THE PARKING FACILITY IS LOCATED. THIS AGREEMENT SHALL BE GOVERNED BY THE FEDERAL ARBITRATION ACT, IN ACCORDANCE WITH THE RULES OF THE AMERICAN ARBITRATION ASSOCIATION THEN IN EFFECT.

JUDGMENT MAY BE ENTERED ON THE ARBITRATOR'S AWARD IN ANY COURT HAVING JURISDICTION. THE DECISION OF THE ARBITRATOR SHALL BE FINAL AND BINDING ON THE PARTIES. THE PARTIES SHALL BEAR THEIR OWN EXPENSES IN ANY PROCEEDING. EACH PARTY SHALL BEAR ITS OWN LEGAL FEES IN ANY DISPUTE EXCEPT THAT WITH RESPECT TO A PARTY THAT PREVAILS ON ANY MATERIAL ISSUE, THE ARBITRATORS SHALL AWARD LEGAL FEES ATTRIBUTABLE TO THOSE MATTERS OTHER THAN WITH RESPECT TO FRIVOLOUS POSITIONS TAKEN AS DETERMINED BY THE ARBITRATOR.

52.     The "Parking Agreement" also does not comply with Annapolis City Code regulations governing privately owned garages. The Annapolis Code states: "Every person operating a parking place shall erect at each entrance to the parking place a sign bearing the following information: (1) [t]he rate by day or hour and whether or not there is a difference in rates on certain days or times of day; (2) [t]he name, telephone number and business address of the operator of the parking place, together with the number of the operator's license or permit." City Code of Annapolis, Ch. 12.28.050. Ch. 12.28.010 states that all signage must consist of "a durable and legible sign, the lettering of which ***shall be not less than one inch in height that is erected in a conspicuous place***." City Code of Annapolis, Ch. 12.28.010 (emphasis added).

53.     The "Parking Agreement" is not a valid or enforceable contract for the same reasons as described in ¶ 38, <u>supra</u>.

### *Vanguard's Illegal Data Collection Practices*

54.     At garages where it operates, including the 1515 New York Ave. Garage and 275 West St. Garage, Vanguard uses LPR scanners and related software to record the license plate information of each vehicle that enters the garage, along with a corresponding time stamp.

55.     Similarly, Vanguard uses the LPR scanners and related software to record the license plate information of each vehicle that exits the garage, with another corresponding time stamp.

56.     Vanguard's technology is integrated with the online payment platforms in use at the 1515 New York Ave. Garage and 275 West St. Garage.

57.     If a vehicle parks in either garage and is identified as leaving without paying the required fee, Vanguard's technology automatically logs the violation.

58.     Then, on behalf of the garage owners, Joyce, and itself, Vanguard pursues payment from registered owners of vehicles identified as not having paid, usually by sending a physical "Parking Payment Notice" ("Notice") to the registered driver through the mail.

59.     To generate a Notice, Vanguard obtains, or causes to be obtained, a registered vehicle owner's personal information, including name and address, from a state motor vehicle record database.

60.     Vanguard then mails, or causes to be mailed, a Notice to the registered owner's address.

61.     Vanguard does not use state motor vehicle record database-sourced personal information to verify, correct, or supplement personal information previously provided directly by the driver or registered owner.  Instead, Vanguard obtains that personal information for the first time from motor vehicle records and then uses it to create new enforcement records and to mail private parking invoices, follow-up notices, and collection letters to vehicle owners' homes.

62.     Vanguard designs its Notices to look like government-issued traffic violation tickets.

63.     A typical Notice includes a picture of the owner's vehicle entering and exiting the garage, along with the date and corresponding time stamps.[7]

64.     A typical Notice also indicates an amount due that has no recognizable relationship to the actual parking charge allegedly not paid, and offers a prompt payment "discount" that is still magnitudes larger than any actual parking charge allegedly not paid.

65.     For instance, a typical Notice states: "You have an outstanding balance of $85.00, this amount is due 15 days from the parking payment notice date.  If you pay within 15 days of

---

[7] See, e.g., Plaintiff Vaillant's Notice depicted infra as Image 11.

22

the parking payment notice date, you get a discounted Parking Charge in the amount of $55.00, plus any applicable state sales tax and/or parking surcharges.  If you fail to pay within the 15 days, then you are responsible to pay the full amount of the Parking Charge up to a maximum amount of $125."

66.     The Notice also warns that "failure to make the payment may result in referral to collections, arbitration, or further legal action."

67.     The Notice directs the recipient to pay online at www.payparkingnotice.com or to mail a check or money order to an address in Hollywood, Florida.

68.     The "Terms and Conditions" associated with Vanguard's online payment portal at www.payparkingnotice.com state: "By accessing or using the Website or paying Parking Charges on our Website, you signify your acceptance of these Terms," and that, "BY AGREEING TO THESE TERMS, YOU HEREBY PROVIDE VANGUARD PARKING WITH YOUR EXPRESS CONSENT TO OBTAIN YOUR NAME AND MAILING ADDRESS FROM THE STATE DEPARTMENT OF MOTOR VEHICLES PURSUANT TO 18 U.S.C. § 2721."[8]

***Plaintiffs' Allegations***[9]

**<u>Plaintiff Sullivan</u>**

69.     Plaintiff Brianne Sullivan entered the 1515 New York Ave. Garage on November 15, 2025, at 9:12 a.m.

---

[8] See https://help.payparkingnotice.com/article/5-terms.

[9] Although these facts illustrate the heinous customer experience encountered by each of the named Plaintiffs after parking at the garages, many of those facts are not necessary to the determination of Defendants' liability in this case. For the reasons described *infra*, Defendants have acted unlawfully as to every customer who has parked in the 1515 New York Ave. Garage and every customer who has paid after receiving a violation notice related to the 275 West St. Garage since Vanguard took over operations at each garage.

70.    Ms. Sullivan parked at the garage because she needed to return some purchases at Target.

71.    The first hour of parking at the 1515 New York Ave. Garage is free.

72.    Prior to Vanguard managing parking at the 1515 New York Ave. Garage, a driver would receive a physical ticket when they parked and have the ticket validated at Target, which would ensure the driver did not have to pay for the first hour of parking.

73.    Because Ms. Sullivan knew that there would not be a charge for the first hour of parking and she did not expect to be at Target for longer than one hour, she did not activate a parking session with any of the available parking payment apps at the 1515 New York Ave. Garage.

74.    Ms. Sullivan never entered into any parking agreement or contract with any of the Defendants.

75.    Ms. Sullivan did not even see, let alone read, any of the Vanguard "Parking Contract" signs posted at the 1515 New York Ave. Garage.

76.    It took Ms. Sullivan longer than she expected to complete her returns at Target due to a line at customer service.

77.    When she returned to the garage, she looked for a kiosk, attendant, or security guard that could assist her with paying for the few extra minutes beyond the initial free hour, but there were no such resources, nor a telephone number listed anywhere that she could call for assistance.

78.    Ms. Sullivan exited the garage at 10:38 a.m.

79.    Ms. Sullivan did not provide Vanguard or any of Defendants with her name or address, nor did she consent in writing to them obtaining her personal information.

24

80.    On or about November 25, 2025, Ms. Sullivan received a violation notice from Vanguard.

81.    The notice indicated that Ms. Sullivan had parked at the garage for one hour and 26 minutes.

82.    The noticed stated that Ms. Sullivan owed $85.00 for the parking payment violation, plus $5.10 for processing and service fees and $4.99 for an online convenience fee, for a total due of $95.09.



*Image 10: Screenshot from www.payparkingnotice.com after logging in with Ms. Sullivan's violation number*

83.    On November 25, 2025, Ms. Sullivan initiated a dispute online at www.payparkingnotice.com, as directed by Vanguard on her violation notice, to explain that she

25

had tried to pay for the 26 minutes of parking she used on November 15 that was not free, but that she was unable to do so.

84. Ms. Sullivan explained that she would be happy to pay the standard rate for that time (*i.e.*, $3.35 for less than two hours), but that $95.09 was excessive under the circumstances.

85. Ten minutes later, a Dispute Analyst with the ironically named Fair Recovery Adjudication[10] responded by email that "[r]ecords show no system issues at the time of this parking session" and that "[c]learly posted signs ... clearly state the parking rules and regulations." The Dispute Analyst then wrote, "Parking notices are sent at the non-negotiable industry standard rate for the violation, not for how many minutes you did not pay for. Unfortunately, the hourly rates are no longer available, as they are forfeited once you exit the lot."

86. Fourteen minutes later, Ms. Sullivan sent an email stating that the Dispute Analyst's response was not sufficient, and that she did "not wish to be subjected to arbitrary and excessive charges that were not appropriately posted or communicated." She also noted that most of the time exceeding one hour during which she was parked "was spent trying to figure out the signage and payment system." She asked with whom she could speak regarding next steps.

87. The Dispute Analyst replied to Ms. Sullivan three minutes later. The email in full read:

> Hello,
> There are five different payment apps for this lot, as well as a phone number you can call. **Records show no system issues at the time of this parking session.**

---

[10] When a consumer disputes a Vanguard violation notice by sending a message through the portal at www.payparkingnotice.com, they receive a response from an individual with an email address that ends in @fairrecoveryadjudication.com. According to its website, "Fair Recovery Adjudication provides impartial third-party review services to ensure parking notices disputes are evaluated fairly, consistently, and based on clear evidence." https://fairadjudication.com/. In Plaintiffs' experience, Fair Recovery Adjudication does not actually evaluate disputes fairly, consistently, or based on the evidence, and appears to act solely as an agent of Vanguard. Fair Recovery Adjudication is not registered to do business in D.C. or Maryland.

This notice is valid due to nonpayment of your 26 minute overstay, and will not be canceled.

Please be advised that the notice you received is **valid**, and there is **no further escalation or alternative contact person available regarding this matter.**

Due to the *repetitive* nature of recent communications, *we may not issue further replies.*

Regards,
Kanesha
**Failure to pay this notice may result in further legal action and/or the towing of your vehicle from any property enforced by Vanguard Parking throughout the United States.**

If the notice is marked as **"valid"** *further replies may not be issued.*

**Vanguard** notices can be paid by visiting payparkingnotice.com
**RevPass** notices can be paid by visiting PayRevPass.com

Please be advised, emails may take up to 2 **business** days to be addressed
--
Dispute Analyst,
Fair Recovery Adjudication

***Please note that replies may take up to two business days. If you've already spoken with a representative and your notice was marked VALID at that time, you may not receive a further reply.***

88.     Ms. Sullivan found the Dispute Analyst's response dismissive and rude. She felt that engaging further would be futile, so she did not respond.

89.     As of the filing of this Complaint, Ms. Sullivan has not paid the fees and charges Vanguard alleges she owes.

### *Plaintiff Vaillant*

90.     Plaintiff Charles "Pat" Vaillant entered the 275 West St. Garage on the evening of November 8, 2025, at 5:54 p.m. because he was going to dinner at a restaurant nearby.

91.     Mr. Vaillant paid $5.70 for two hours of parking at the posted rate (*see* Image 5, *supra*), using the ZipBy app.

92.     Mr. Vaillant received email confirmation from ZipBy that his payment was successful.

93.     Mr. Vaillant exited the garage at 7:16 p.m.—well within the two hours for which he had paid.

94.     Mr. Vaillant never entered into any parking agreement or contract with any of the Defendants.

95.     Mr. Vaillant did not even see, let alone read, any of the "Parking Agreement" signs posted at the 275 West St. Garage.

96.     Mr. Vaillant did not provide Vanguard or any of Defendants with his name or address, nor did he consent in writing to them obtaining his personal information.

97.     Shortly thereafter, Mr. Vaillant received a "Parking Payment Notice" from Vanguard dated November 10, 2025, for nonpayment.  The Notice included an "amount now due" of $90.10, which would increase to $125.00 after November 25, 2025.



*Image 11: "Parking Payment Notice" issued to Mr. Vaillant*

28

98. On November 16, 2025, Mr. Vaillant initiated a dispute through Vanguard's website, www.payparkingnotice.com, as directed on his violation notice. Mr. Vaillant stated that he had paid $5.70 through ZipBy on November 8, 2025, and he included a photo of the garage signage listing $5.70 as the charge for two hours and noted that Vanguard's own time stamps showed he had parked at the 275 West St. Garage for less than two hours.

99. On November 17, 2025, Mr. Vaillant received a response from an individual with Dispute Resolution Senior Management at Fair Recovery Adjudication who asked for proof of payment for Mr. Vaillant's "entire parking session, 1 hour and 22 mins."

100. Mr. Vaillant responded with a copy of his ZipBy receipt from November 8, 2025, which showed a payment of $5.70 but erroneously listed a start time of 17:56 and an end time of 17:58.

101. A Dispute Analyst responded to Mr. Vaillant on November 18, 2026, writing that his payment showed two minutes and stating he could contact ZipBy to request that they fix the error.

102. Mr. Vaillant responded on November 20, 2025, that "[t]here is no error," because he had been charged the correct amount.

103. The same day, the Dispute Analyst responded:

Hello,

Once again: **Your payment shows two minutes. You can go ahead and contact ZipBy and request they fix their error.**

As you only paid for two minutes of time, as shown on the receipt you sent, this notice remains valid and will not be canceled.

Regards,
Kanesha

**Failure to pay this notice may result in further legal action and/or the towing of your vehicle from any property enforced by Vanguard Parking throughout the United States .**

If the notice is marked as **"valid"** *further replies may not be issued.*

**Vanguard** notices can be paid by visiting payparkingnotice.com
**RevPass** notices can be paid by visiting PayRevPass.com

Please be advised, emails may take up to 2 **business** days to be addressed
--
Dispute Analyst,
Fair Recovery Adjudication

*Please note that replies may take up to two business days. If you've already spoken with a representative and your notice was marked VALID at that time, you may not receive a further reply.*

104.    On November 21, 2025, Mr. Vaillant emailed support@zipby.app, explained the situation, provided the necessary information regarding his purchase with ZipBy, and asked for a corrected receipt.

105.    On November 22, 2025, Mr. Vaillant received an email from ZipBy customer service stating, "Thank you for reaching out.  I need to direct you to Joyce Parking for your request.  Please contact their team via email at HBizuayehu@joyceparking.com and they will be in contact with you shortly."

106.    On November 24, 2025, Mr. Vaillant sent a detailed email to HBizuayehu@joyceparking.com, explaining the situation and asking for help resolving it.  Mr. Vaillant sent a follow-up email the same day attaching supporting documents related to his dispute.

107.    On November 25, 2025, Mr. Vaillant emailed ZipBy and stated that he had reached out to Joyce Parking but had not received a response.  A little over an hour later, he received the same form response from ZipBy directing him to contact Joyce Parking at HBizuayehu@joyceparking.com.

108.    On December 1, 2025, Mr. Vaillant emailed Joyce Parking again because he had received no response.

109.    On December 3, 2025, Mr. Vaillant emailed Fair Recovery Adjudication to state that he had received a second notice and that he had already provided proof of payment.  He received a response the same day referring him to the previous emails sent to him.

110.    On December 4, 2025, Mr. Vaillant informed the Dispute Analyst at Fair Recovery Adjudication that he was going to file a Better Business Bureau complaint about Vanguard's practices, which he did on December 6, 2025.

111.    On December 18, 2025, Mr. Vaillant engaged in a live online chat with support@fairadjudication.com, stating that he continued to receive violation notices despite having sent proof that he paid for parking.  He also said that he filed a complaint with the Better Business Bureau.  He had the following conversation with an AI-chat agent, "Cathy":

[CATHY:] Nothing has changed unfortunately; Zip By has not contacted us.

[VALLIANT:] I sent my receipt proving I paid $5.70 for two hours so I don't understand why I keep getting notifications.

[CATHY:] This has been explained to you. On our end, your payment shows 2 minutes. You are welcome to reach out to Zip By.

[VALLIANT:] The issue is with Vanguard. I paid $5.70 regardless of what Zipby receipt shows. What should I have paid?

[CATHY:] I can not answer that as we do not own the lot or the parking app.

[VALLIANT:] I did everything I was supposed to do and yet I feel I am being harassed by Vanguard[.]

[CATHY:] I have unfortunately provided all the information I can regarding this matter. The notice is valid and will not be canceled.

I need to move on to my next chat now. If you have any new questions regarding any new matters, please email Support@fairadiudication.com.

Thank you and have a great rest of your day.

112. Also on December 18, 2025, Mr. Vaillant emailed HBizuayehu@joyceparking.com again, explained the situation, stated he had emailed before and received no response, and asked that they contact him.

113. Mr. Vaillant received a response from Haimanot Bizuayehu at Joyce Parking the same day, asking that he send the notice from Vanguard and his proof of payment "to investigate and get circle [sic] back with you."

114. Mr. Vaillant emailed the requested documents to Mr. Bizuayehu on December 18, 2025, and followed up by email on December 22, 2025. Mr. Vaillant never heard from Mr. Bizuayehu again.

115. On January 12, 2026, Mr. Vaillant received an email from "Zip US" stating they could not "authenticate/confirm" his claim with the information he had provided, and asking for him to send a screenshot or PDF of his credit card statement showing the last four digits of his credit card number and the ZipBy purchase. Mr. Vaillant sent the requested information and has not heard back.

116. On January 16, 2026, Mr. Vaillant sent an urgent email to Joyce Parking stating that he received what Vanguard called a "Final Notice" threatening to send his account to a collection agency. Mr. Vaillant wrote, "I believe you are the only option I have to put an end to this harassment." He offered to forward his documents again if needed.

117. Finally, Mr. Vaillant received a letter dated February 2, 2026, from Beiss Law Firm PLLC in Fort Lauderdale, Florida, with the subject line, "**DEMAND FOR IMMEDIATE PAYMENT – AGGREGATE PARKING NOTICES**." The letter stated, "Beiss Law Firm, representing Vanguard Parking Solutions, hereby demands immediate payment of $90.10 for

32

unpaid parking charges you incurred at Vanguard properties. These charges arose when your vehicle(s) parked without paying the posted fee, or by violating the Terms and Conditions of the Parking Contract prominently displayed at each location." The letter had an amount due of $90.10, gave directions to pay via QR code, online, or by telephone, and warned, "Should this matter remain unresolved, our client has instructed us to pursue all available remedies, including arbitration or litigation as applicable." The letter was signed by Ben Beiss, Esq.

118. As of the filing of this complaint, Mr. Vaillant has not paid the fees and charges Vanguard alleges he owes.

119. Mr. Vaillant has not received any further response from Vanguard, Joyce Parking, Fair Recovery Adjudication, ZipBy, or the Beiss Law Firm.

### *Plaintiff Albright*

120. Ms. Albright entered the 275 West St. Garage at 10:28 a.m. on February 19, 2026, because she was meeting a friend for brunch in downtown Annapolis.

121. Ms. Albright opened the ParkMobile app in the garage and believed she had paid for two hours, but when she checked the app during brunch, she realized she had not had cell phone service in the garage and her payment had not gone through. From the restaurant, Ms. Albright paid $5.70 for two hours of parking, so her parking session ran from 11:51 a.m. to 1:51 p.m. Ms. Albright attempted to adjust the start time in the app to account for the time her car had already been parked in the garage, but the app did not allow this.

122. Ms. Albright left the 275 West St. Garage at 12:48 p.m. on February 19, 2026.

123. Ms. Albright never entered into any parking agreement or contract with any of the Defendants.

124.    Ms. Albright did not even see, let alone read, either of the "Parking Agreement" signs posted at the 275 West St. Garage.

125.    Ms. Albright did not provide Vanguard or any of the Defendants with her name or address, nor did she consent in writing to them obtaining her personal information.

126.    Shortly thereafter, Ms. Albright received a "Parking Payment Notice" from Vanguard dated February 20, 2026, for nonpayment.

127.    The Notice included a "discounted amount now due" of $90.10, which would increase to $125.00 after March 7, 2026.



*Image 12: First "Parking Payment Notice" sent to Ms. Albright*

128.    Ms. Albright went to the website provided on the Notice, www.payparkingnotice.com, to dispute the violation.  When she entered her violation number to dispute it, she received a notification that her violation number was not valid, but when she entered the same violation number for payment, it came up as valid.

129.    Frustrated, Ms. Albright called the telephone number on her Parking Payment Notice, but a computerized voice assistant answered her call.  She repeatedly said that she

wanted to speak to a human being, but was told that there were no people present and if she completed a dispute form someone would contact her. The voice assistant then gave her the address for the same payment website she had already visited.

130.    On March 5, 2026, Ms. Albright sent a letter to the P.O. Box address on the Notice, disputing the violation and including a screenshot of her proof of payment. She never received a response.

131.    Ms. Albright later received another Parking Payment Notice dated February 22, 2026, that simply stated she owed $90.10. Unlike the first Notice, it did not include a larger amount due after the due date of March 9, 2026.



*Image 13: Second "Parking Payment Notice" sent to Ms. Albright*

132.    On April 19, 2026, Ms. Albright was able to complete the dispute form at www.payparkingnotice.com. She stated that she had paid for parking on February 19 via the ParkMobile app, and she attached her proof of payment. Ms. Albright candidly noted that she

35

had been unable to pay for 20 minutes of parking due to the technical issue with the ParkMobile app and lack of cell service in the garage, and wrote, "I would be happy to pay some extra but I feel $90 for 20 minutes is excessive."  Finally, Ms. Albright stated: "I was previously unable to access this form, so I mailed an appeal to the PO Box my parking notice was sent from and never received a reply."

133.    On April 20, 2026, a Senior Customer Service Associate with Fair Recovery Adjudication responded to Ms. Albright and stated that Ms. Albright's payment on February 19 had been delayed and failed to cover the full time she parked.  She also wrote: "**Unfortunately, the notice is currently over 30 days past due and is no longer eligible for dispute (as stated on all three notices sent).**" [11]  The Senior Customer Service Associate said that, "[p]arking notices are set at the *non-negotiable* industry standard rate for failure to pay for parking," and "the hourly rates are no longer available, as they are forfeited once you exit the lot."  She also wrote: "**Required** signs are posted inside the lot stating the penalty rate. The notice fee unfortunately is not related to what it costs to park on the lot, nor to how many minutes someone didn't pay for."

134.    The same day, Ms. Albright emailed a response.  Her email in full stated:

Hello,

The notice is over 30 days past due because it is impossible to get in contact with a human being from this company. I attempted to file a dispute when I first got the notice and it kept telling me that the 6364C number was invalid to open the dispute form, yet it would allow me to pay. I then called the number on the form, which does not allow you to speak to a person, and sent me a link to the same form which would not work. That is why I mailed my appeal, which if you check your PO Box and find my letter, I'm sure was sent within 30 days. It seems like this company intentionally makes it difficult to contact a human being and dispute the parking notices, I suppose in hopes that everyone will give up and simply pay the fine.

---

[11] Ms. Albright has only retained two Parking Payment Notices.

I am not understanding why despite proof that I did pay for 2 hours of parking, during which I was not in the garage, I still owe $90 for the 20 minutes I did not pay. The app did not give me an option to adjust the time that I paid for so I am not sure what exactly I was supposed to do in this situation.

Additionally, I have found numerous accounts of people online being sent fines from this garage for similar situations: the timing was off, their license plate was typed wrong, etc. And again, they found it impossible to dispute because your "customer service line" is run by a robot and you CANNOT contact a human being. This feels very much like a scam.

135.    One minute later, Ms. Albright received the following response:

Thank you for your message. Your dispute was reviewed and a decision was made on April 20, 2026. This decision is final.

This conversation is now closed and will not be monitored for further replies.

136.    On May 27, 2026, Ms. Albright mailed a cashier's check for $90.10 to Vanguard at the address listed on her violation notice: P.O. Box 5540, Deptford, NJ, 08096.

## PROPOSED CLASSES

137.    Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Federal Rule of Civil Procedure 23.  All Plaintiffs seek to represent the following class:

**Class A (DPPA class)**

**All persons who entered the 1515 New York Ave. Garage or the 275 West St. Garage, and whose personal information contained in a motor vehicle record was obtained, disclosed, or used by Defendants for purposes not permitted under the DPPA, 18 U.S.C. 2721, et seq., and in violation of federal consumer and debt collection laws, during the four-year period prior to the filing of this lawsuit through the date of class certification.**

138.    Plaintiff Sullivan also seeks to represent the following Class:[12]

---

[12] In this class definition and hereafter, the "D.C. Defendants" are Vanguard, Jemal's D.C., and Joyce.  The phrase "D.C. violations" in this class definition includes: purporting to bind class members to unfair and deceptive terms and provisions for parking; misrepresenting and/or misstating class members' rights; obtaining, disclosing, or using class members' personal information contained in a motor vehicle record for purposes not permitted under the

37

**Class B (D.C. class)**

**All persons who entered the 1515 New York Ave. Garage and against whom the D.C. Defendants committed the D.C. violations, in violation of the D.C. Consumer Protection Procedures Act, D.C. Code Ann. § 28-3901, et seq., and D.C. common law, during the three-year period prior to the filing of this lawsuit through the date of class certification.**

139.    Plaintiff Albright also seeks to represent the following Class:[13]

**Class C (Maryland class)**

**All persons who entered the 275 West St. Garage, whose personal information contained in a motor vehicle record was obtained, disclosed, and/or used by the Maryland Defendants for purposes not permitted under the DPPA, to whom the Maryland Defendants mailed or caused to be mailed parking violation notices while Vanguard was not licensed by the State Collection Agency Licensing Board, and against whom the Maryland Defendants committed the Maryland violations, in violation of state consumer protection and debt collection laws and state common law, and who paid the charges in such notices during the three-year period prior to the filing of this lawsuit through the date of class certification.**

140.    Excluded from these Classes are:

a.    All officers, directors, affiliates, legal representatives, shareholders, subsidiaries, and employees of Defendants, as well as their immediate family members;

b.    Any entity in which a Defendant has a controlling interest;

c.    All attorneys for Defendants in the current matter and their immediate family members; and

d.    The judge presiding over this action and the members of their immediate family and judicial staff.

---

DPPA, including to mail or cause to be mailed parking violation notices; and/or any other violation of the D.C. Consumer Protection Procedures Act, D.C. Code Ann. § 28-3901, et seq.

[13] In this class definition and hereafter, the "Maryland Defendants" are Vanguard, Jemal's MD, and Joyce.  The phrase "Maryland violations" in this class definition includes: engaging in unfair, abusive, and deceptive trade practices; claiming, attempting, or threatening to enforce a non-existent right to collect inflated fees; using abusive, harassing, and deceptive conduct to collect an alleged debt; and/or any other violation of Maryland consumer protection laws.

**CLASS ALLEGATIONS**

141.    This action is properly maintained as a class action under Federal Rule of Civil Procedure 23 in that questions of law or fact common to members of each Class predominate over questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this dispute.

*Numerosity*

142.    Pursuant to Federal Rule of Civil Procedure 23(a)(1), the members of each Class are so numerous that joinder of all members is impracticable.

143.    The 1515 New York Ave. Garage and the 275 West St. Garage each have over 100 spaces for vehicle parking.  Vanguard, on behalf of Joyce and the Owners, uses LPR technology to record the license plate information of every vehicle that enters and exits at both garages.  Defendants also consider every consumer who enters the garages to be subject to the unenforceable and illegal "Parking Agreement" or "Parking Contract."

144.    Each Class numbers at least in the hundreds, and certainly more than 40, given Defendants' standardized enforcement practices at the respective garages.  Class B numbers at least in the thousands because it encompasses every driver who has parked in the 1515 New York Ave. Garage since Vanguard began operating at the garage.

145.    Vanguard's website indicates that a customer with 150 parking spaces can expect to have Vanguard issue 23 violation notices per month, and a customer with 300 spaces can expect to have Vanguard issue 45 violation notices per month.  Therefore, it is likely that approximately 276 violations notices per year are issued in connection with the 1515 New York Ave. Garage, and 540 violations per year are issued in connection with the 275 West Street Garage.

146. Because Defendants have collected the personal information of thousands of potential Class members, membership in each Class is readily ascertainable using common, centralized proof.

*Commonality and Predominance*

147. Pursuant to Federal Rule of Civil Procedure 23(a)(2), there are questions of law and fact common to each Class, and these questions predominate over any questions affecting individual Class members.

148. These common questions of law and fact may include, but are not limited to, the following:

   a. Whether Defendants knowingly obtained, disclosed, and/or used Plaintiffs' and the Class members' personal information from state motor vehicle records;

   b. Whether any permissible use under 18 U.S.C. § 2721(b) applies to Defendants' conduct;

   c. Whether Vanguard has represented that, by parking at the 1515 New York Ave. Garage or 275 West St. Garage, consumers confer on Vanguard rights and remedies it does not have or which are prohibited by law, and give up rights or remedies that the consumers should by law have;

   d. Whether the Maryland Defendants' universal trade practices regarding parking and/or enforcement at the 275 West St. Garage are unfair, abusive, and/or deceptive within the meaning of the Maryland Consumer Protection Act, Md. Code Ann., Commercial Law Article §§ 13-101, et seq.;

   e. Whether the D.C. Defendants' universal trade practices regarding parking and/or enforcement at the 1515 New York Ave. Garage are unfair, deceptive, and/or

misleading within the meaning of the D.C. Consumer Protection Procedures Act, D.C. Code §§ 28-3901, et seq.;

f.  Whether Vanguard is required pursuant to the Maryland Collection Agency Licensing Act ("MCALA"), Md. Code Ann., Bus. Reg. §§ 7-101, et seq., to be licensed with Maryland's State Collection Agency Licensing Board as a collection agency;

g.  Whether Vanguard is a debt collector for purposes of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692, et seq.;

h.  Whether Vanguard's standard collection practices at the 1515 New York Ave. Garage and/or the 275 West St. Garage violate the FDCPA;

i.  Whether the Owners and/or Joyce are liable for Vanguard's acts and omissions;

j.  Whether the Owners and/or Joyce were negligent in hiring or supervising Vanguard for parking enforcement at the 1515 New York Ave. Garage and the 275 West St. Garage;

k.  Whether Defendants' violations of the DPPA constitute negligence *per se*;

l.  Whether Defendants received and retained a benefit that they should not in good conscience be allowed to retain in connection with parking enforcement at the 1515 New York Ave. Garage and/or the 275 West St. Garage;

m.  Whether Defendants engaged in a civil conspiracy;

n.  Whether the formation of the "Parking Contract" at the 1515 New York Ave. Garage and the "Parking Agreement" at the 275 West St. Garage was valid, including but not limited to the alleged agreement to arbitrate;

o.  Whether Defendants have acted or refused to act on grounds that apply generally to Class A such that injunctive relief is appropriate; and

p.  The extent to which punitive damages are recoverable where authorized by law.

149.    Materially identical claims and injuries are implicated by this action.  Individual questions, if any, pale by comparison, in both quantity and substance, to the common questions that dominate this action.

### *Typicality*

150.    Pursuant to Federal Rule of Civil Procedure 23(a)(3), Plaintiffs' claims as representative parties are typical of the claims of Class A because Plaintiffs, like all Class A members, had their protected personal information from state motor vehicle records obtained, used, and/or disclosed by Defendants for the same non-permitted purposes under the DPPA. They were also all subjected to Defendants' violations of federal debt collection law and to Joyce/Owners' negligent acts and omissions.

151.    Plaintiff Sullivan's claims are typical of the claims of Class B because she, like all Class B members, was subject to Defendants' unfair and deceptive trade practices and illegal debt collection practices in connection with parking at the 1515 New York Ave. Garage.

152.    Plaintiff Albright's claims are typical of the claims of Class C because she, like all Class C members, was subject to and damaged by Defendants' abusive, harassing, and deceptive trade practices and illegal debt collection practices in connection with parking at the 275 West St. Garage, and she paid the excessive violation fees charged by Defendants, the retention of which is unjust and inequitable.

*Adequacy*

153.    Pursuant to Federal Rule of Civil Procedure 23(a)(4), Plaintiffs and their counsel will fairly and adequately protect the interests of the Classes.

154.    Plaintiffs seek the same recovery as that sought on behalf of each Class, predicated upon the same theories of liability and damages.

155.    Plaintiffs' counsel are seasoned civil litigators who have successfully litigated large, complex class-action matters.

156.    Paul Caiola, Plaintiffs' lead counsel, is a first-chair commercial litigator with extensive experience in complex and class litigation.  Mr. Caiola served as lead counsel in Clark v. Peter G. Angelos, *et al.*, No. 24-C-21-000847 (Circuit Court for Baltimore City, Maryland), a legal malpractice class action regarding a law firm's failure to timely pursue claims on behalf of its clients who were victims of asbestos-related diseases.  The case resulted in a $57 million settlement.  Mr. Caiola also served as plaintiffs' counsel in Gorres v. Robinson, No. GLR-21-3029 (D. Md.), a case filed as a class action by recipients of unemployment insurance against the Maryland Secretary of Labor, which led to procedural and systemic improvements in the administration of that insurance system.

157.    Jean Zachariasiewicz, Plaintiffs' counsel, is an experienced civil litigator and plaintiff-side consumer class action lawyer.  As one example, Ms. Zachariasiewicz was counsel in Westminster Management, LLC v. Smith, No. 24-C-17-004797 (Circuit Court for Baltimore City, Maryland), a class action challenging a property manager's charging of excessive late fees and improper allocation of rent payments, leading to unwarranted evictions.  The Maryland Supreme Court held that the trial court erred in its consideration of plaintiffs' second motion for

43

class certification and the class was certified on remand.  See Westminster Mgmt., LLC v. Smith, 486 Md. 616 (2024).

158.   Plaintiffs and Plaintiffs' counsel are aware of no conflicts that could interfere with their ability to adequately represent the interests of the Classes.

159.   Plaintiffs' counsel and their colleagues, collectively, already have devoted many hours to investigating and analyzing the facts and the law related to the claims in this case and are very familiar with the underlying procedural and legal issues.  Plaintiffs' counsel will zealously advocate on behalf of Plaintiffs and the Classes.

### *Superiority*

160.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy under Federal Rule of Civil Procedure 23(b)(3).

161.   Individual claims by members of the Classes are impracticable because the costs to pursue individual claims exceed the value of what any one Class member has at stake.  As a result, individual Class members have no strong interest in prosecuting and controlling separate actions.  Should any members desire to pursue their claims individually, they will have an opportunity to opt out of the Classes at the class certification stage.

162.   The interests of justice will be better served by resolving the common disputes of potential Class members in one forum.

163.   This Court is an appropriate forum for the proposed class action because all Defendants conduct business in the District of Columbia, and some of the business practices and injuries complained of took place in the District of Columbia.  In addition, two out of the four Defendants are entities formed in the District of Columbia, and all Defendants carry on their regular business in the District of Columbia.

164.    The action is manageable as a class action.

165.    The class action device provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

**COUNT I**
**Driver's Privacy Protection Act ("DPPA"), 18 U.S.C. §§ 2721–2725**
*Alleged Individually by All Plaintiffs and on Behalf of All Members of Class A*
*against All Defendants*

166.    Plaintiffs re-allege and incorporate by reference the allegations set forth in each of the foregoing paragraphs.

167.    Under the DPPA, "[a] person who knowingly obtains, discloses or uses personal information, from a motor vehicle record, for a purpose not permitted under this chapter shall be liable to the individual to whom the information pertains, who may bring a civil action in a United States district court."  18 U.S.C. § 2724(a).

168.    "Personal information" under the DPPA "means information that identifies an individual, including an individual's photograph, social security number, driver identification number, name, address (but not the 5-digit zip code), telephone number, and medical or disability information, but does not include information on vehicular accidents, driving violations, and driver's status."  18 U.S.C. § 2725(3).

169.    A "motor vehicle record" under the DPPA "means any record that pertains to a motor vehicle operator's permit, motor vehicle title, motor vehicle registration, or identification card issued by a department of motor vehicles."  18 U.S.C. § 2725(1).

170.    Plaintiffs and the members of Class A are "persons" as defined by 18 U.S.C. § 2725(2) and are "individual[s] to whom [personal information obtained, disclosed, or used] pertains," within the meaning of 18 U.S.C. § 2724(a).

171.    Defendants knowingly obtained, disclosed, and/or used Plaintiffs' and the Class A members' personal information from motor vehicle records, directly or through agents or resellers with access to such records, without consent or authorization, including without "express consent," which is defined as "consent in writing" in 18 U.S.C. § 2725(5), for a purpose not permitted under 18 U.S.C. § 2721(b).  Defendants used that illegally obtained information for the purpose of generating a substantial profit in the form of inflated parking fines at the garages.

172.    In the alternative, Joyce and the Owners are vicariously liable for Vanguard's violations of the DPPA because they, as principals, knowingly employed, engaged, authorized, directed, hired, contracted with, retained, and/or requested Vanguard, as agent, to unlawfully obtain information in violation of the DPPA in order to increase their revenues from the respective garages.

173.    Joyce and the Owners knew that Vanguard intended to access personal information from motor vehicle records, but they failed to use reasonable care to ensure that the information was being obtained for a permissible use exception under 18 U.S.C. § 2721(b).

174.    As a result of Defendants' DPPA violations, Plaintiffs and the Class A members suffered injury, including loss of control of their protected personal information, invasion of privacy, and the risk of being subject to collection actions resulting in damage to their credit scores.

175.    Plaintiffs and the Class A members are entitled to punitive damages pursuant to 18 U.S.C. § 2724(b)(2) because Defendants acted in willful and reckless disregard of the law.

176.    Plaintiffs and the Class A members face a real and immediate threat of repeated *de facto* injury per the DPPA.  Defendants continue to operate the same systematic practice of LPR-based enforcement and illegal state motor vehicle record lookup at the garages in a way that

46

is generally applicable to Class A.  Plaintiffs and the Class A members are likely to be in a situation where they need to park in these two garages again, as the 275 West St. Garage is one of only a few garages that services the busy downtown, commercial district in Annapolis, MD (where street parking is extremely scarce), and the 1515 New York Ave. Garage directly services the popular Target store.  Therefore, it is likely that Plaintiffs and the Class A members will continue to suffer harm as a result of Defendants' continued violations of the DPPA.  Furthermore, Vanguard retains Plaintiffs' and the Class A members' personal information for future disclosure or use, including but not limited to potential transmission of that personal information to third-party collection vendors for additional collection efforts.

177.    Monetary relief alone cannot prevent Vanguard from obtaining, disclosing, and/or using Plaintiffs' and the Class A members' personal information in the future, nor can it ensure that Vanguard deletes personal information already in its systems, records, and control.  Without injunctive relief, Defendants will remain free to continue obtaining, disclosing, and/or using Plaintiffs' and the Class A members' personal information, in violation of the DPPA.

178.    The balance of hardships favors Plaintiffs and the Class A members, and the public interest supports the enforcement of an injunction against Defendants' illegal actions in the future.

**WHEREFORE**, Plaintiffs, both individually and on behalf of the other Class A members, request that this Court enter an Order:

A.    Certifying Class A, appointing Plaintiffs as representatives of Class A, and appointing undersigned counsel as class counsel;

47

B.      Finding that Defendants violated the DPPA by knowingly obtaining, disclosing, and/or using Plaintiffs' and the Class A members' personal information from motor vehicle records for a purpose not permitted under the DPPA;

C.      Finding Joyce and the Owners vicariously liable for Vanguard's violations of the DPPA;

D.      Awarding monetary damages to Plaintiffs and to each member of Class A in the amount of, at minimum, $2,500 per violation;

E.      Issuing preliminary and permanent injunctions prohibiting Defendants from:

      i.      Accessing and using driver personal information from state motor vehicle records for any non-exempt purpose under the DPPA; and

      ii.     Maintaining, storing, disclosing, distributing, or selling driver personal information illegally accessed through state motor vehicle records, on behalf of themselves and any third-party vendors or recipients within Defendants' control.

F.      Awarding punitive damages against Defendants in an amount to be determined at trial;

G.      Awarding all pre- and post-judgment interest to the maximum extent permitted by law;

H.      Awarding the reasonable attorneys' fees, costs, and expenses incurred in the investigation, filing, and prosecution of this action to the maximum extent permitted by law; and

I.      Granting such other relief as the Court determines to be appropriate.

## COUNT II
**Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692e, 1692f, 1692g**
*Alleged Individually by All Plaintiffs and on Behalf of All Members of Class A*
*against Defendant Vanguard*

179.   Plaintiffs re-allege and incorporate by reference the allegations set forth in each of the foregoing paragraphs.

180.   Plaintiffs and the Class have been the targets of collection activity arising from consumer debt as that term is defined in 15 U.S.C. § 1692a(5).

181.   Vanguard is a "debt collector" pursuant to 15 U.S.C. § 1692a(6) because it uses the telephone and/or mail in a business where the principal purpose is the collection of a debt. Vanguard also regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another.  Specifically, Vanguard, on behalf of Joyce and the Owners, collects or purports to collect the debts owed or allegedly owed to Owners by consumers for their use of the parking garages.  Vanguard treats this debt as if it were in default the moment a consumer leaves the garages.

182.   Section 1692e of the FDCPA prohibits the use of "false, deceptive, or misleading representation or means in connection with the collection of any debt."  15 U.S.C. § 1692e. Section 1692e further provides a non-exhaustive list of practices that fall within this ban, including, but not limited to:

a. "The use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer," 15 U.S.C. § 1692e(10); and

b. "The failure to disclose in the initial written communication with the consumer . . . that the debt collector is attempting to collect a debt and that any information obtained will be used for that purpose[.]"  15 U.S.C. § 1692e(11).

49

183.    Section 1692f(1) of the FDCPA states that "[a] debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt[,]" which includes "[t]he collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law."  15 U.S.C. § 1692f(1).

184.    Section 1692g of the FDCPA provides that, "[w]ithin five days after the initial communication with a consumer in connection with the collection of any debt, a debt collector shall, unless the following information is contained in the initial communication or the consumer has paid the debt, send the consumer a written notice containing" a specific list of information set forth in § 1692g(a)(1)-(5).  15 U.S.C. § 1692g.

185.    Vanguard violated 15 U.S.C. § 1692e by using false, deceptive, or misleading representations or means to collect an alleged debt from Plaintiffs and the Class A members, including, but not limited to, by illegally accessing personal data from motor vehicle records to send misleading invoices to consumers that misrepresent their rights and demand payment of an illegal debt vastly exceeding the fair market rate of the services the consumers ostensibly received; by pressuring consumers into immediate payment without providing any meaningful way for consumers to challenge these illegal debts; by threatening collection activity to further pressure consumers to pay; and by wasting consumers' time with a sham dispute resolution system engineered to resolve claims in favor of Vanguard.

186.    Vanguard violated 15 U.S.C. § 1692e(11) by failing to disclose to consumers in its parking payment notices that it was a debt collector that was attempting to collect a debt, and that any information obtained would be used for that purpose.

187.    Vanguard violated 15 U.S.C. § 1692f by using unfair or unconscionable means to collect or attempt to collect an alleged debt from Plaintiffs and the Class A members, including, but not limited to, by attempting to collect amounts not expressly authorized by a valid agreement, by employing a deceptive payment model that pressures consumers into immediate payment, and by not providing a meaningful dispute resolution process.

188.    Vanguard violated 15 U.S.C. § 1692g by failing to disclose in the initial parking payment notices, or by a separate written notice within five days thereafter, the information required by Section 1692g(1)-(5).  Specifically, Vanguard failed to provide a written notice that contained: (1) the name of the creditor to whom the debt is owed; (2) "a statement that unless the consumer, within thirty days after receipt of the notice, disputes the validity of the debt, or any portion thereof, the debt will be assumed to be valid"; (3) "a statement that if the consumer notifies the debt collector in writing within the thirty-day period that the debt, or any portion thereof, is disputed, the debt collector will obtain verification of the debt or a copy of a judgment against the consumer and a copy of such verification or judgment will be mailed to the consumer by the debt collector"; and (4) "a statement that, upon the consumer's written request within the thirty-day period, the debt collector will provide the consumer with the name and address of the original creditor, if different from the current creditor."  15 U.S.C. § 1692g(a)(2)-(5).

189.    As a result of these violations, Plaintiffs and the Class A members suffered harm, including, but not limited to, pecuniary damage and being subjected to false, deceptive, and misleading debt collection practices.

**WHEREFORE**, Plaintiffs, both individually and on behalf of the other Class A members, request that this Court enter an Order:

A.      Certifying Class A, appointing Plaintiffs as representatives of Class A, and appointing undersigned counsel as class counsel;

B.      Finding that Vanguard violated the FDCPA because Plaintiffs and the Class A members were the targets of collection activity arising from a consumer debt, Vanguard is a debt collector as defined by the FDCPA, and Vanguard engaged in acts and/or omissions prohibited by the FDCPA;

C.      Awarding statutory damages to Plaintiffs and the Class A members pursuant to 15 U.S.C. § 1692k(a);

D.      Awarding all pre- and post-judgment interest to the maximum extent permitted by law;

E.      Awarding reasonable attorneys' fees and costs to the maximum extent permitted by law; and

F.      Granting such other relief as the Court determines to be appropriate.

## COUNT III
**D.C. Consumer Protection Procedures Act ("CPPA"), D.C. Code Ann. §§ 28-3901, *et seq.***
*Alleged Individually by Plaintiff Sullivan and on Behalf of All Members of Class B*
*Against D.C. Defendants*

190.    Plaintiffs re-allege and incorporate by reference the allegations set forth in each of the foregoing paragraphs.

191.    The purpose of the CPPA is to "remedy all improper trade practices and deter the continuing use of such practices," and "promote . . . fair business practices throughout the community." D.C. Code Ann. § 28-3901(b)(1)–(2).

192.    Section 28-3904 of the CPPA enumerates a non-exhaustive list of unlawful acts, making it a violation "for any person to engage in an unfair or deceptive trade practice, whether or not any consumer is in fact misled, deceived, or damaged thereby[.]" D.C. Code Ann. § 28-

52

3904. This list includes, among other things, "misrepresent[ion of] a material fact which has a tendency to mislead" (Section 28-3904(e)); "fail[ure] to state a material fact if such failure tends to mislead" (Section 28-3904(f)); and "mak[ing] or enforce[ing] unconscionable terms or provisions of sales or leases" (Section 28-3904(r)). See D.C. Code Ann. § 28-3904.

193. Plaintiff Sullivan and the Class B members are "consumers" who purchased or received "consumer services" relating to parking. See D.C. Code Ann., § 28-3901(a).

194. The D.C. Defendants are "merchants" and "person[s]" as defined by D.C. Code Ann. § 28-3901(a)(1), (3).

195. The D.C. Defendants engaged in unfair and deceptive trade practices, including but not limited to:

   a. Illegally accessing and using private driver data from state motor vehicle records in violation of the DPPA;

   b. Posting deceptive and misleading signage and alleged disclosures that purport to bind consumers to an illegal contract;

   c. Attempting to make and/or enforce unconscionable terms and provisions of sale;

   d. Misrepresenting and failing to disclose material terms and pricing of parking services through misleading, incomplete, and inconspicuous signage and notices that drivers cannot reasonably read or access before incurring charges;

   e. Representing that consumers using the garage consent to extensive contractual terms, waivers, arbitration, and data access merely by parking, despite the inconspicuous, inaccessible, and unenforceable nature of the purported contract;

   f. Issuing deceptive and misleading payment notices to consumers by illegal means that demand immediate payment of inflated fees;

g.  Charging unauthorized fees that are disproportionately high as compared to the rate of daily parking;

h.  Instituting a confusing payment structure intended to scare consumers into making immediate payment without asking questions;

i.  Misrepresenting and/or misstating consumers' rights in both posted signage and payment notices; and

j.  Failing to provide a fair, functional, transparent, and meaningful dispute resolution process; duping consumers into participating in a sham dispute resolution process; impeding consumers' ability to dispute fee and charges.

196.    Alternatively, Joyce and Jemal's D.C. are vicariously liable for Vanguard's violations of the CPPA because they are "merchants" and "respondents" as defined by D.C. Code Ann. § 28-3901(a).  At all relevant times, Vanguard was acting within the scope of its role as agent on behalf and for the benefit of Joyce and Jemal's D.C. at the 1515 New York Ave. Garage.  See D.C. Code Ann. § 28-3901(a).  Those entities also aided and abetted Vanguard in carrying out its illegal parking enforcement scheme.

197.    Plaintiff Sullivan and the Class B members relied on the D.C. Defendants' unfair or deceptive trade practices when parking at the 1515 New York Ave. Garage.  The D.C. Defendants' misrepresentations and omissions were material and likely to mislead reasonable consumers.

**WHEREFORE**, Plaintiff Sullivan, both individually and on behalf of the other Class B members, requests that this Court enter an Order:

A.    Certifying Class B, appointing Plaintiff Sullivan as representative of Class B, and appointing undersigned counsel as class counsel;

54

B.      Finding that the D.C. Defendants' conduct violated the CPPA;

C.      Finding that, in the alternative to direct liability, Joyce and Jemal's D.C. are vicariously liable for Vanguard's violations of the CPPA;

D.      Awarding statutory damages of $1,500 per violation to Plaintiffs Sullivan and the Class B members;

E.      Awarding all pre- and post-judgment interest to the maximum extent permitted by law;

F.      Awarding punitive damages and reasonable attorneys' fees and costs to the maximum extent permitted by law; and

G.      Granting such other relief as the Court determines to be appropriate.

## COUNT IV
**Maryland Consumer Protection Act ("MCPA"),**
**Md. Code Ann., Com. Law ("CL") §§ 13-101, et seq.**
*Alleged Individually by Plaintiff Albright and on Behalf of All Members of Class C*
*Against The Maryland Defendants*

198.    Plaintiffs re-allege and incorporate by reference the allegations set forth in each of the foregoing paragraphs.

199.    The MCPA prohibits unfair, abusive, and deceptive trade practices in consumer transactions.  CL § 13-301 provides a non-exclusive list of what constitutes an "unfair, abusive, or deceptive trade practice," including, but not limited to:

a. "False, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers[.]"  CL § 13-301(1).

b. "Failure to state a material fact if the failure deceives or tends to deceive[.]"  CL § 13-301(3).

55

c. "Deception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with . . . the promotion or sale of any consumer goods, consumer realty, or consumer service[.]"  CL § 13-301(9)(i).

200.   Plaintiff Albright and the Class C members are "consumer[s]" within the meaning of CL § 13-101(c).

201.   The Maryland Defendants engaged in unfair, abusive, and deceptive trade practices, including but not limited to:

a. Illegally accessing and using private driver data from motor vehicle records in violation of the DPPA;

b. Violating the Maryland Consumer Debt Collection Act (see CL § 13-301(14)(iii)), as discussed infra;

c. Posting deceptive and misleading signage and alleged disclosures that purport to bind consumers to an illegal contract;

d. Misrepresenting and failing to disclose material terms and pricing of parking services through misleading, incomplete, and inconspicuous signage and notices that drivers cannot reasonably read or access before incurring charges;

e. Representing that drivers consent to extensive contractual terms, waivers, arbitration, and data access merely by parking, despite the inconspicuous, inaccessible, and unenforceable nature of the purported contract;

f. Issuing deceptive and misleading payment notices to consumers by illegal means that demand immediate payment of inflated fees;

g.   Charging an unauthorized fee that is disproportionately high as compared to the rate of daily parking;

h.   Instituting a confusing payment structure intended to scare consumers into making immediate payment without asking questions;

i.   Misrepresenting and/or misstating consumers' rights in both posted signage and in payment notices;

j.   Failing to provide a fair, functional, transparent, and meaningful dispute resolution process; duping consumers into participating in a sham dispute resolution process; and impeding the consumers' ability to dispute the fee; and

k.   Enabling and profiting from these practices through the coordinated participation of the garage operator and owners.

202.   Alternatively, Joyce and Jemal's MD are vicariously liable for Vanguard's violations of the MCPA because, at all relevant times, Vanguard was acting within the scope of its role as agent on behalf and for the benefit of Joyce and Jemal's MD at the 275 West St. Garage.  Those entities also aided and abetted Vanguard in carrying out its illegal parking enforcement scheme.

203.   The Maryland Defendants' material violations of the MCPA are uniformly applicable to Plaintiff Albright and the Class C members.

204.   Plaintiff Albright and the Class C members relied on the Maryland Defendants' unfair, abusive, and deceptive practices or misrepresentations when parking at the 275 West St. Garage and when paying for that service.

205.    Plaintiff Albright and the Class C members have suffered actual injury and loss as a result of the Maryland Defendants' MCPA violations, including, but not limited to, pecuniary damage.

206.    The Maryland Defendants' uniform practices caused the same type of economic loss to Plaintiff Albright and all Class C members.

**WHEREFORE**, Plaintiff Albright, both individually and on behalf of the other Class C members, requests that this Court enter an Order:

A.    Certifying Class C, appointing Plaintiff Albright as representative of Class C, and appointing undersigned counsel as class counsel;

B.    Finding that the Maryland Defendants violated the MCPA because their conduct constituted an unfair and/or deceptive trade practice or misrepresentation that was relied upon by Plaintiff Albright and the Class C members, thereby causing them actual injury or loss;

C.    Finding that the Maryland Defendants *per se* violated the MCPA because of their violations of the Maryland Consumer Debt Collection Act, discussed infra;

D.    Awarding monetary damages to Plaintiff Albright and the Class C members in an amount to be determined at trial;

E.    Awarding all pre- and post-judgment interest to the maximum extent permitted by law;

F.    Awarding reasonable attorneys' fees and costs to the maximum extent permitted by law; and

G.    Granting such other relief as the Court determines to be appropriate.

**COUNT V**
**Violations of the Maryland Consumer Debt Collection Act ("MCDCA"),**
**CL §§ 14-201, *et seq.*,**
*Alleged Individually by Plaintiff Albright and on Behalf of All Members of Class C*
*Against the Maryland Defendants*

207.    Plaintiffs re-allege and incorporate by reference the allegations set forth in each of the foregoing paragraphs.

208.    The MDCDA prohibits abusive, harassing, and deceptive conduct by any person who collects or attempts to collect a consumer debt.  CL §14-202(8) provides that a "collector" may not "claim, attempt, or threaten to enforce a right with knowledge that the right does not exist."

209.    CL § 14-201(b) defines "collector" to mean "a person collecting or attempting to collect an alleged debt arising out of a consumer transaction."

210.    CL § 14-201(c) defines "consumer transaction" to mean "any transaction involving a person seeking or acquiring real or personal property, services, money, or credit for personal, family, or household purposes."

211.    CL § 14-201(c) defines "person" to include individuals, corporations, and any other legal or commercial entity.

212.    Vanguard is a "collector" pursuant to CL § 14-201(b) because it collected or attempted to collect an alleged debt arising out consumers' use of the 275 West St. Garage.

213.    Vanguard, on behalf of Joyce and Jemal's MD, sought to collect alleged debts owed to the Owners via the payment notices sent to consumers by illegal means.  Those payment notices demanded inflated fees that were wildly disproportionate to the daily parking rate at the 275 West St. Garage.  In sending these notices, Vanguard knew that it lacked any contractual right to demand these inflated fees because it had no enforceable contract with individual

consumers.  Vanguard therefore claimed, attempted, or threatened to enforce a non-existent right with actual knowledge or with reckless disregard as to the falsity of the existence of the right.

214.    Vanguard's methods of collection also constituted abusive, harassing, and deceptive conduct in violation of the MCDCA.  Vanguard illegally obtains driver information to issue payment notices that are legally insufficient, confusing, misstate or mischaracterize consumer's rights, and are intended to scare consumers into immediate payment.  Moreover, Vanguard does not provide any sort of meaningful dispute resolution process to challenge the inflated fees.

215.    As owners and operators, Joyce and Jemal's MD are also collectors within the meaning of CL § 14-201(b) and are collecting or attempting to collect, using Vanguard's services, an inflated debt in connection with a consumer transaction that they know they have no right to collect.  Alternatively, Joyce and Jemal's MD are vicariously liable for Vanguard's violations of the MDCDA.

216.    As a result of the Maryland Defendants' MCDCA violations, Plaintiff Alright and the Class C members have suffered damages, including, but not limited to, pecuniary loss.

217.    Violations under the MCALA, infra, and the FDCPA, supra, are *per se* violations of the MCDCA, which in turn are *per se* violations of the MCPA, supra. See CL §§ 13-301(14)(iii); 14-202(10).

**WHEREFORE**, Plaintiff Albright, both individually and on behalf of the other Class C members, requests that this Court enter an Order:

A.    Certifying Class C, appointing Plaintiff Albright as representative of Class C, and appointing undersigned counsel as class counsel;

60

B.      Finding that Maryland Defendants violated the MCDCA because they claimed, attempted, or threatened to enforce a right with knowledge that the right does not exist;

C.      Finding that the Maryland Defendants *per se* violated the MCDCA as a function of their violations of the MCALA and the FDCPA;

D.      In the alternative, finding that Joyce and Jemal's MD are vicariously liable for Vanguard's violations of the MCDCA;

E.      Awarding monetary damages to Plaintiff Albright and the Class C Members in an amount to be determined at trial;

F.      Awarding all pre- and post-judgment interest to the maximum extent permitted by law;

G.      Awarding reasonable attorneys' fees and costs to the maximum extent permitted by law; and

H.      Granting such other relief as the Court determines to be appropriate.

## COUNT VI
**Maryland Collection Agency Licensing Act ("MCALA"), Md. Code Ann., Bus. Reg. § 7-101, *et seq.***
*Alleged Individually by Plaintiff Albright and on Behalf of All Members of Class C*
*Against Defendant Vanguard*

218.    Plaintiffs re-allege and incorporate by reference the allegations set forth in each of the foregoing paragraphs.

219.    MCALA requires any person or entity engaged in the business of consumer debt collection activities in Maryland to obtain a license from the State Collection Agency Licensing Board ("the Board"), unless a specific statutory exemption applies. Bus. Reg. §§ 7-101, 7-301(a).

61

220.    MCALA broadly defines a "collection agency" as any person who engages "directly or indirectly" in the business of: (1) "collecting for or soliciting from another a consumer claim," or "collecting a consumer claim the person owns if the claim was in default when acquired;" (2) "collecting a consumer claim using a name indicating another party is attempting collection"; (3) "giving, selling, or using collection forms or letters indicating a person other than the owner is asserting the claim"; or (4) "employing services to solicit or sell collection systems for consumer claims."  Bus. Reg. §  7-101(c).

221.    A "consumer claim" is a claim for money owed by a Maryland resident arising from a transaction where the resident sought credit, money, personal property, real property, or services for family, household, or personal purposes.  Bus. Reg. §  7-101(e).

222.    All "collection agenc[ies]," as defined by Bus. Reg. §  7-101(c), must be licensed by the State Collection Agency Licensing Board unless exempted.  Bus. Reg. § 7-301(a).

223.    Vanguard is a "collection agency" as defined by Bus. Reg. §  7-101(c) because it engages in the business of collecting alleged outstanding parking fees on behalf of Joyce and Jemal's MD.  None of the exemptions apply to Vanguard.  See Bus. Reg. §§ 7-102(b), 7-301(b).

224.    The alleged parking fees at issue in this case constitute "consumer claim[s]" pursuant to Bus. Reg. §  7-101(e) because the fees are allegedly owed in connection with public parking, which is a service for personal purposes.

225.    Vanguard is not licensed with the Board to collect consumer debt in Maryland.

226.    Vanguard is therefore in violation of MCALA as a matter of law.  See Bus. Reg. § 7-301(a).

227.    A violation of MCALA is a *per se* violation of the MCDCA, which in turn is a *per se* violation of the MCPA.  *See* Md. Code Ann., CL §§ 13-301(14)(iii); 14-202(10).

**WHEREFORE**, Plaintiff Albright, both individually and on behalf of the other Class C members, requests that this Court enter an Order:

A.    Certifying Class C, appointing Plaintiff Albright as representative of Class C, and appointing undersigned counsel as class counsel;

B.    Finding that Vanguard was required to be licensed with the Board;

C.    Finding that Vanguard is not licensed with the Board, and therefore is in violation of MCALA pursuant to Bus. Reg. § 7-301(a);

D.    Awarding appropriate damages under the MCDCA and/or the MCPA to compensate Plaintiff Albright and the Class C members for Vanguard's MCALA violation; and

E.    Granting such other relief as the Court determines to be appropriate.

## COUNT VII
### Negligence
*Alleged Individually by All Plaintiffs and on Behalf of All Members of Class A*
*Against Defendant Owners and Joyce*

228.    Plaintiffs re-allege and incorporate by reference the allegations set forth in each of the foregoing paragraphs.

229.    The Owners and Joyce owed an independent and non-delegable duty to Plaintiffs and the Class A members as property owners/operators to maintain reasonably safe and non-deceptive parking premises and policies, to supervise contractors, and to prevent foreseeable harm to invitees arising from contractor misconduct on their premises.  They also owed a duty under the DPPA to use reasonable care in determining whether a permissible use exception under that statute applied when they hired/contracted with Vanguard.

230.    The Owners and Joyce breached these duties by engaging, either directly or through an agent, Vanguard, whose unlawful parking enforcement and debt collection scheme was apparent from its website and marketing materials.  The Owners and Joyce failed to

63

undertake a reasonable inquiry into Vanguard's illegal enforcement and collection scheme at the time of hiring, which was ultimately the proximate cause of Plaintiffs' and the Class A members' injuries.

231. The Owners and Joyce are also negligent *per se* as a result of their violations under the DPPA. The DPPA was designed to promote safety and to protect a class of persons comprised of individuals whose protected information has been misused or disclosed for an impermissible purpose. Plaintiffs and the Class A members are squarely part of that protected class of persons, and the unauthorized disclosure of personal information from motor vehicle records was the type of harm that in fact occurred as a result of the Owners and Joyce's DPPA violations. The DPPA imposes specific duties and obligations on the Owners and Joyce, as the owners and operators of the parking garages and ticketing enforcement systems, not to access driver motor vehicle information for impermissible purposes. The Owners and Joyce flagrantly breached those duties and obligations with respect to the respective garages.

232. As a result of the Owners and Joyce's breaches, Plaintiffs and the Class A members suffered harm, including but not limited to pecuniary damage, invasion of privacy, disregard for their rights as consumers, and loss of control over personal protected information.

**WHEREFORE**, Plaintiffs, both individually and on behalf of the other Class A members, request that this Court enter an Order:

A. Certifying Class A, appointing Plaintiffs as representatives of Class A, and appointing undersigned counsel as class counsel;

B. Finding that the Owners and Joyce owed Plaintiffs and the Class A members a duty of care, that the Owners and Joyce breached that duty, and that Plaintiffs and the Class A members suffered damages as a result of those breaches;

C.       Finding that the Owners and Joyce were negligent *per se* as a result of their DPPA violations;

D.       Awarding damages and pre- and post-judgment interest to Plaintiffs and the Class A members in amounts to be determined at trial; and

E.       Granting such other relief as the Court determines to be appropriate.

## COUNT VIII
### Unjust Enrichment
*Alleged Individually by Plaintiff Albright and on Behalf of All Members of Classes A Against All Defendants*

233.    Plaintiffs re-allege and incorporate by reference the allegations set forth in each of the foregoing paragraphs.

234.    An action for unjust enrichment lies when a plaintiff confers a benefit on the defendant; the defendant knowingly retains the benefit; and under the circumstances, the defendant's retention of the benefit is unjust or inequitable.

235.    Plaintiffs and the Class members conferred a benefit upon the Defendants by paying demanded amounts, fees, and "violations" arising from the challenged practices.

236.    The Defendants had knowledge of and appreciated the benefit conferred, as they received payments directly or indirectly and shared revenues generated by the illegal enforcement scheme.  The Defendants all received and have retained profit in connection with the systematic and illegal enforcement practices challenged herein.

237.    It would be inequitable and unjust for the Defendants to retain these benefits because the payments were procured through illegal, deceptive, and unfair practices, and through a process designed to pressure payment of amounts not owed or grossly exceeding any disclosed obligation.

238.    Equity and good conscience require restitution and disgorgement of all monies wrongfully obtained by the Defendants from Plaintiffs and the Class A members.

**WHEREFORE**, Plaintiffs, both individually and on behalf of the other Class A members, request that this Court enter an Order:

A.    Certifying Class A, appointing Plaintiffs as representative of Class A, and appointing undersigned counsel as class counsel;

B.    Finding that the Defendants have been unjustly enriched;

C.    Ordering restitution and disgorgement of all amounts the Defendants unjustly received from Plaintiffs and the Class A members, in an amount to be determined at trial;

D.    Awarding pre- and post-judgment interest at the maximum rate permitted by law; and

E.    Granting such other relief as the Court determines to be appropriate.

## <u>COUNT IX</u>
**Civil Conspiracy**
*Alleged Individually by All Plaintiffs and on Behalf of All Members of Class A*
*Against All Defendants*

239.    Plaintiffs re-allege and incorporate by reference the allegations set forth in each of the foregoing paragraphs.

240.    Defendants conspired to increase parking revenue at the 1515 New York Ave. Garage and the 275 West St. Garage, respectively, through unlawful means.

241.    In furtherance of this conspiracy, Vanguard obtained, and all Defendants used, drivers' personal information from motor vehicle records for a purpose not permitted by law.

242.    Defendants' unlawful acts injured Plaintiffs and the members of Class A, including by causing pecuniary damage, loss of control of their protected personal information,

invasion of privacy, and the risk of being subject to collection actions resulting in damage to their credit scores.

**WHEREFORE**, Plaintiffs, both individually and on behalf of the other Class A members, request that this Court enter an Order:

A.      Certifying Class A, appointing Plaintiffs as representatives of Class A, and appointing undersigned counsel as class counsel;

B.      Finding that Defendants are liable for civil conspiracy;

C.      Awarding punitive damages against Defendants in an amount to be determined at trial;

D.      Awarding actual damages and pre- and post-judgment interest to Plaintiffs and the Class A Members in amounts to be determined at trial; and

E.      Granting such other relief as the Court determines to be appropriate.

## PRAYER FOR JURY TRIAL

Plaintiffs respectfully request a trial by jury on all issues so triable.

Date: June 5, 2026                                    Respectfully submitted,


    /s/ Paul S. Ciola
Paul S. Caiola, Esq. (Bar No. MD23940)
Jean M. Zachariasiewicz, Esq. (Bar No. 1019973)
GALLAGHER LLP
650 S. Exeter St., Suite 1200
Baltimore, MD  21202
Telephone: (410) 727-7702
Fax: (410) 468-2786
pcaiola@gallagherllp.com
jzachariasiewicz@gallagherllp.com

*Attorney for Plaintiffs*